MILLER v. RAILROAD.

(Filed November 21, 1906).

*Railroads—Passengers—Instructions.*

1. In an action for injuries to a passenger on a caboose car, an instruction that "plaintiff admits that he asked the conductor if he could ride on his train, and was told by him that he could, but to wait until he got through his work, and he would pull the caboose up to the station," was erroneous where there was evidence from which the jury might find that the plaintiff admitted only that while the conductor did tell him to wait a few minutes and he would pull the caboose up to the station, he regarded it merely as a favor offered to him by an obliging conductor and not as a denial to him of the right to enter the car, or even as a warning to him not to do so.

2. It is not proper, after laying down a legal proposition, as applicable to a supposed state of facts, if found by the jury, to instruct them,

as a deduction therefrom, that the plaintiff is or is not entitled to recover, but simply to direct them how to answer the issues by applying the law as stated by the Court to the facts as they may find them to be.

ACTION by Jasper Miller against Atlanta and Charlotte Air Line Railway Company, heard by *Judge R. B. Peebles* and a jury, at the October Term, 1906, of the Superior Court of MECKLENBURG.

This action was brought to recover damages for an injury to the plaintiff's hand, alleged to have been caused by the negligence of the defendant. There are numerous exceptions, but we need consider only one. The plaintiff testified that on the day the injury was received he was at Gastonia and went to the station to take the freight train for Charlotte. He then said:

"I found Captain Clapp, the conductor of the local freight, standing there as I walked up. A freight train was standing at the crossing and an engine was also at the crossing. Captain Clapp was standing about fifty to sixty feet from the crossing. I asked Captain Clapp if I could ride with him to Charlotte on the local freight. He replied, 'Certainly.' I said 'Thank you,' and started to go down to get on the caboose of the train where passengers rode. He said, 'If you will wait a little, I will pull the train up further.' I said, 'No, much obliged; I will not put you to that trouble,' and walked down to the caboose. When I spoke to him and told him I would not put him to that trouble, he was standing facing me and looking at me. While he was facing me I moved on, I suppose about 200 yards, and got in the caboose at the rear of the train, which was standing on the main line of the road. The train appeared to be coupled up and ready to move off. The doors of the caboose were open; there was no one inside; nothing but the seats, and everything of that kind pertaining to that kind of a train was there. The caboose was used as a passenger and conductor's car for the crew. When

I got in the car I sat on a seat between the two doors. It was warm. I had a bundle of samples and laid them down. I was sitting between the middle door of the caboose and the side doors. I was leaning towards the side of the caboose and was figuring on a piece of paper. When I got aboard the caboose the flagman of the train was just coming down the steps. He asked me if I were going to remain on the run going to Charlotte, and I told him I was. The flagman asked me to watch the car while he was out. I told him all right, I would do it. I suppose I had been on the caboose two or three minutes before this conversation occurred with the flagman. He gave me no warning whatever. After I had the conversation with him and while I was sitting on the end of the bench between the two doors figuring, a collision took place, caused by the backing of some cars against the caboose, which came with such force that I was thrown to the door, my right hand caught the door, and it being a rolling door, was jerked and shut by the collision and my fingers on my left hand, on account of the same, were mashed into a pulp. The door cut my fingers at the end and mashed them into pulp. As soon as I could get myself together I caught my left arm with my right hand and tried to stop the flow of blood, which rushed out at every pulsation. I wrapped a handkerchief around the fingers and ran up to the ice-cooler in the caboose and turned the water on, which intensified the pain. Just then the front door was opened and the caboose was stricken again by the cars and the shock came near throwing me under the cars. I caught around by the side and held the best I could until I got myself and tried to fasten the door. It had a latch on it, but it just flew back and forth as if it had nothing on it to control the same. Any motion of the car would throw the latch out. I sat there and tried to brace myself in case of another accident. In a few minutes the cars came back again against the caboose and

threw me from the seat some distance on the floor, and I lay there until I saw the engine and tender going by on another track. I then got off the train, and when it started again I got on. My hip was injured. The latch to the door fell over a nail or little spike instead of a staple, and it flew back and forth with the movement of the train. There was no fastening to the side door. After I had the conversation with the conductor about riding with him on the train to Charlotte, I walked down by the side of the train, which was all coupled up and ready to pull out, as it looked to me. There was no obstruction between the conductor and me—nothing to prevent him seeing me. I signed the paper when I came to Charlotte the night of the injury. When I spoke to the conductor and asked him if I could travel on his freight train, I said, 'Captain, can I ride with you to Charlotte?' and he said, 'Certainly.' I said, 'Much obliged,' and started to walk down, and he said, 'If you will wait, I will pull the train a little further up,' and I said, 'No, much obliged; I will not put you to that trouble.' When the statement which you show me and which I signed was signed I was in very great pain. I signed that paper at night, and I don't think I took time to read anything, I was in so much pain."

Defendant's counsel then asked the witness: "I notice in the statement which you signed, you say, 'He then told me to wait a few minutes and I will pull the caboose to the station.'" The witness then proceeded: "No, he did not say that. He said, 'If you will wait.' He did it as a favor to me and I appreciated it, and told him I would not put him to that trouble."

Question by the Court: "You thought he was doing that as a favor to you?"

Ans.: "No; pulling the train up would be a favor. My impression is that the conductor said that if I would wait he would pull the train a little further up. Before I signed the

statement I did not say, 'I am not going to do anything further about this; it was my own fault.' I did not say to Captain Clapp and Mr. Stahl that it was my own fault and I was not going to do anything further with the business. Captain Clapp said: 'This is trouble; a man has got hurt.' I told him, 'I hope there will be nothing further about it.' I did not think there would be. I did not know I was so seriously hurt. When they asked me to make a statement I wanted to exonerate Captain Clapp. I did not think he was to blame. The engineer or the flagman ought to have notified me of the backing of the cars against the caboose. It was about 150 to 200 yards from where I saw Captain Clapp down to the caboose. The engine was right at the station. It was a long train. The doors of the caboose were all open. The flagman had not closed the doors when I got on. He came in afterwards and asked me if I was going to Charlotte, and if I was, to remain in. When I went down to the caboose the train was all coupled up. Captain Clapp did not tell me he was going to make up his train. He said, 'If you will wait, I will pull the train a little further up.' I sat down on the seat and began to figure. The conductor did not tell me there was any danger. I went in the rear door of the caboose car. There was a partition across the middle. There were seats on each side. Passengers ride on any of the seats in there. They all sat in that section. The train got so rough in going to Charlotte that some of the train crew sat behind and tried to brace themselves against the partition."

The rules of the company were introduced by the plaintiff, and among them are the following:

"Rule 610. When their trains are ready for the reception of passengers, they (flagmen or brakemen) must take positions at the car steps and give all necessary assistance and information to passengers."

"Rule 613. They (brakemen or flagmen) must prevent passengers from going upon platforms and, as far as possible,

from getting on and off trains while in motion, and from incurring other risks, or violating any of the rules of the company provided for their safety."

There was testimony tending to contradict the witness Miller, and to show that he left the conductor and went to the caboose, which he entered, contrary to the directions he had received from the conductor, and that when told by the conductor that if he had followed his directions he would not have been hurt, he replied that he did not blame the conductor and he had not been at fault.

The defendant introduced in evidence a written statement prepared shortly after the plaintiff was injured and signed by him, in which he gave the following account of the occurrence. "I went to the station and found that the local freight would be along in a few minutes and was told by some one at the hotel that I could come over on that. Pretty soon the local arrived, and I asked the conductor if I could come over on his train, and he told me I could. He then told me to wait a few minutes and he would pull the caboose up to the station, but I told him I would walk down to the cab, and did so. Pretty soon one of the trainmen came to the caboose and asked me if I was going to remain in the cab, and after telling him I intended coming to Charlotte with them, he asked me if I would watch the cab a short time for him, and I told him I would. In a few minutes after he left, and while I was sitting on the bench near the side door of the cab there was a very severe slack or jar of the train that threw me forward from where I was sitting, and I grabbed the door-facing to break the fall and the door caught my left hand, mashing and bursting the ends of my middle fingers. The door was a sliding door on rollers and was moved by same jar that threw me from my seat. In about fifteen minutes the crew of the train came to the cab and I told them what had happened. The pain was very painful until about ten minutes after the

accident, when there was another severe jar which knocked me from my seat to the floor, and after that I did not feel so much of the pain. I wasn't hurt by the last fall. I came on to Charlotte on the local train No. 64. I did not buy a ticket, but paid the conductor cash fare."

The Court among other instructions gave the following one to the jury:

"1. The plaintiff admits that he got on this freight train, that carried freight and passengers, two hundred yards from the station. 2. He admits that he asked the conductor if he could ride on that train to Charlotte, and was told by him that he could, but to wait until he got through his work, and he would pull the caboose up to the station. 3. If you find as a fact from the evidence that, at the time he got on the caboose, it was not hitched on and connected, coupled with the engine, he was on the car wrongfully, and he cannot recover in this action. 4. But if you find from the evidence that the car was coupled up in apparent readiness to go, why, then, your finding upon the first issue will depend upon other circumstances."

The Court then proceeded to charge at length as to the duty and liability of the defendant and the care required of the plaintiff under the different phases of the case as disclosed by the testimony.

The plaintiff excepted to each of these instructions. The usual issues as to negligence, contributory negligence and damages were submitted. The jury answered the first issue, as to negligence, "No." The Court having overruled a motion for a new trial and entered judgment on the verdict, the plaintiff excepted and appealed.

*Brevard Nixon* for the plaintiff.
*George F. Bason* for the defendant.

WALKER, J. It seems to us that the Court erred in two respects. We do not think it can be reasonably inferred from

the testimony that the plaintiff admitted, or intended to admit, that the conductor told him to wait until he had finished his work and the caboose had been drawn up to the station, in the sense that he was forbidden by the conductor to enter the caboose until this had been done; and that he was so forbidden is the clear implication from what is stated by the Court, in the opening of its charge, to have been admitted. The jury might well find from the plaintiff's testimony—and the written statement would not necessarily vary the finding—that the plaintiff admitted only that while the conductor did tell him to wait a few minutes and he would pull the caboose up to the station, he regarded it merely as a favor offered to him by an obliging conductor and not as a denial to him of the right to enter the car, or even as a warning to him not to do so. This is made clear by what he said on the cross-examination, where he gave the following version of the facts: "When I spoke to the conductor and asked him if I could travel on his freight train, I said, 'Captain, can I ride with you to Charlotte?' and he said, 'Certainly.' I said, 'Much obliged,' and started to walk down, and he said, 'If you will wait, I will pull the train a little further up,' and I said, 'No, much obliged; I will not put you to that trouble.' When the statement which you show me was signed, I was in very great pain."

We do not think the written statement materially conflicts with this testimony, although it may not be quite as full and explicit as to what did occur, and even if it does conflict, the truth as to what was said and done was a matter solely within the province of the jury to determine. In *Tillett v. Railroad,* 118 N. C., at p. 1035, it appears that the Court charged the jury, upon evidence which in its general features was not unlike that in this case, as follows: "But if the statement was made by the conductor as simple information in response to a question, and was not intended as a direction or requirement, then no duty was imposed by such statement on the

plaintiff to wait for the train to pull up." With respect to this instruction among others relating to the same matter, the Court, at page 1046, said: "There was no complaint that the question, whether the plaintiff was warned to wait until the car should be drawn up in front of the station, was not properly left to the jury on the last trial. A careful review of the whole statement shows that there was no error."

It is not contended that the plaintiff made any judicial admission in the case which would be binding and conclusive upon him, but it is simply deduced by the Court from all the evidence that he did make the admission attributed to him. This statement of the Judge certainly excluded from the consideration of the jury the right, which the plaintiff clearly possessed, to have them pass upon his testimony and to adopt his version, if they should find it to be the correct one. In eliminating this view of the case from the consideration of the jury, by which the plaintiff was clearly prejudiced, there was reversible error. *Rumbough v. Sackett,* 141 N. C., 495.

We have decided frequently that it is not proper, after laying down a legal proposition as applicable to a supposed state of facts, if found by the jury, to instruct them, as a deduction therefrom, that the plaintiff is or is not entitled to recover, but the proper course is simply to direct them how to answer the issues by applying the law as stated by the Court to the facts as they may find them to be; and this should be the invariable rule when the case is tried upon issues before a jury. In this case, though, his Honor told the jury that if the caboose was not coupled to the engine, or, as we understand him to mean, if the train of cars, including the caboose, was not coupled to the engine, or, in other words, if the train was not "made up," the plaintiff boarded the caboose wrongfully, and was therefore on the car at the time of the injury in his own wrong, and for this reason he could not recover. The liability of the defendant did not exclusively depend upon whether

the caboose, when the plaintiff got on it, was coupled to the engine. If it was not, there were other facts, and other questions to be considered, both in regard to the defendant's negligence and the plaintiff's contributory negligence. There was at least some evidence that the plaintiff had gone to the car and entered it with the knowledge of the company. through its servants, who had charge of the train, if not with their implied consent, and this was sufficient to carry the case to the jury; and besides, even if he was at first to blame for boarding the car, the company might have been guilty of negligence in pushing the cars back against the caboose with unexpected and unnecessary violence and without the exercise of that degree of care which the situation of the plaintiff and the surrounding circumstances required of it.

Whether the plaintiff was himself guilty of such negligence as proximately contributed to his injury, is a question to be determined by the jury upon the evidence under proper instructions from the presiding Judge. It seems to us that the case, in the aspect of it now presented to us, is fully covered by the decision of this Court in *Tillett v. Railroad,* 118 N. C., 1031, which bears a striking similarity in some respects to it. We have so recently discussed the liability of carriers with respect to passengers traveling in caboose cars (*Marable v. Railroad,* 142 N. C., 557) that it is useless to enter upon the general inquiry as to the degree of care required of each under such circumstances.

The errors committed in the charge entitle the plaintiff to another trial.

New Trial.